| | |
|---|---|
| MICHAEL GURGONE, | |
| Plaintiff/Counter-Defendant, | |
| v. | Case No. 16 CV 10549 |
| GLOBAL SIGNAL ACQUISITIONS IV LLC, | Judge Sara L. Ellis |
| Defendant/Counter-Plaintiff. | |

**<u>DEFENDANT/COUNTER-PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Federal Rule of Civil Procedure 56, Defendant/Counter-Plaintiff Global Signal Acquisitions IV LLC ("GSA IV") submits this memorandum of law in support of its Motion for Summary Judgment against Plaintiff/Counter-Defendant Michael Gurgone ("Gurgone").

## INTRODUCTION

The underlying facts in the case are simple and undisputed. GSA IV and its predecessors have owned and operated a communications tower ("Tower") on Gurgone's property since 1998. SprintCom, Inc. and its affiliates ("Sprint") is the telecommunications carrier that has always and continues to operate equipment on the Tower. GSA IV and its predecessors have accessed the Tower via the same existing driveway they have always shared with Gurgone, and have maintained the same paths to connect the Tower to the public utilities. It is undisputed that when GSA IV bought out the lease and obtained a perpetual easement, there was an error in the legal description in certain exhibits to the access and utility easements. Now Gurgone seeks to capitalize on this mutual mistake and use it as an excuse to deny GSA IV and its tenant their contractual twenty-four hours a day, seven days a week access to the Tower and to extort money from GSA IV for "trespass." Such a result is not supported by the law. Instead, Gurgone should be enjoined from his continued blocking of access in breach of the easement and lease agreement, and the exhibits to the agreements need to be corrected to reflect the intent of the parties.

## STATEMENT OF FACTS

### The Agreements Between the Parties

In May 1998, Sprint and Gurgone entered into a PCS Site Agreement whereby Gurgone leased a portion of his property to Sprint, the "Site." Ex. 1, Joint Statement of Undisputed Material Facts ("JSOF") ¶ 5. Sprint leased the Site in order to "erect, operate, and maintain the Tower on the Site." *Id*. The PCS Site Agreement provides for "a non-exclusive easement for reasonable access thereto and to the appropriate, in the discretion of [Sprint], source of electric and telephone

facilities." Ex. 1, ¶ 1, JSOF ¶ 7.  The PCS Site Agreement requires access to the Site "24 hours per day, 7 days per week."  Ex. 1, ¶ 1, JSOF ¶ 8.  The PCS Site Agreement was for an initial term of five years with four additional renewal terms of five years each.  Ex. 1, ¶ 2, JSOF ¶ 9.

The PCS Site Agreement contains hand drawn sketches of the Site.  Ex. 1; JSOF ¶ 11.  The only legal description in the PCS Site Agreement is one of the parent parcel, and not of the Site.  Ex. 1.  There is only a sketch of an access road to the Site via an existing public road.  *Id*.  The access road, or driveway, provides access to both Gurgone's residence and the Tower.  Ex. 3; JSOF ¶ 34.  Gurgone knew Sprint would need to use part of his driveway to get to the Tower.  JSOF ¶ 23.  At or around the time the PCS Site Agreement was executed, Sprint presented, and Gurgone reviewed and approved, oversized construction drawings prepared by Fullerton Contracting Company, which reflect an "Issued for Permit" date of May 28, 1998.  Ex. 3; JSOF ¶ 12.  The drawings contain a legal description for both an access easement and utility easement.  Ex. 3.

On or about June 2, 2006, Gurgone and GSA IV entered into a transaction whereby in exchange for $132,850.00, Gurgone executed an Assignment and Assumption of Lease Agreement ("Assignment") which conveyed, transferred, and assigned to GSA IV the PCS Site Agreement.  Ex. 4; JSOF ¶¶ 4, 13, 31.  At the same time and as part of the same transaction Gurgone executed an Easement in favor of GSA IV regarding the Site and access to it.  Ex. 5; JSOF ¶¶ 14, 31.  Gurgone admits that when he signed the Easement, he knew and expected GSA IV would have access to the Tower under the agreement.  JSOF ¶ 20.  He knew and expected GSA IV would have the same rights as well as access and utility easements as under the PCS Site Agreement.  *Id*. ¶ 21.

Despite the parties' mutual expectation that GSA IV and its agents would continue to be able to use and access the Site as Sprint always has, it is undisputed that there were errors in the exhibits to both the Assignment and Easement agreements.  *Id*. ¶¶ 15–17.  The same erroneous

legal description of the access and utility easement appears as Exhibit B to the Assignment (Exhibit 4) and as Exhibit C to the Easement (Exhibit 5.) *Id.* ¶ 15. Hereinafter this same legal description will be referred to as the "Erroneous Legal Description."

This Erroneous Legal Description contains no legal description for the utility easement, but Gurgone always expected that the utilities would be placed within the utilities easement legal description and boundaries depicted on the construction drawings he had been presented with at the time of the PCS Site Agreement. Ex. 3; JSOF ¶ 16. That is where the utilities had always been placed, and there was a reasonable assumption on everyone's part that the Tower would continue to be connected as it had been in the past. JSOF ¶¶ 16, 21.

Regarding the access easement portion of the Erroneous Legal Description, there is a missing call out. *Id.* ¶ 17. A survey prepared just before the signing of the Assignment and the Easement, when compared to the access easement portion of the Erroneous Legal Description, shows that "THENCE NORTH 43 DEGREES 02 MINUTES 36 SECONDS EAST" is missing from the access easement portion in the Erroneous Legal Description. JSOF ¶ 18; Ex. 6. Gurgone's own surveyor identified this error as well. JSOF ¶ 19. The utility easement portion of the Erroneous Legal Description is missing altogether. *Id.* ¶ 16. The fact that errors exist in the access and utility easements in the exhibits is undisputed. The parties merely dispute the legal consequences of those errors.

Furthermore, even aside from the Erroneous Legal Description, GSA IV has additional rights of access and utilities from the various agreements between the parties. The PCS Site Agreement (which was assigned to GSA IV) grants Sprint "a non-exclusive easement for reasonable access thereto and to the appropriate, in the discretion of [Sprint], source of electric and telephone facilities." Ex 1, ¶ 1; JSOF ¶ 7. The PCS Site Agreement further states Sprint "will

have access to the Site 24 hours per day, 7 days per week." Ex. 1, ¶ 1; JSOF ¶ 8. Similarly, paragraph 3 of the Easement states that "[a]t all times during the Term of the Easement, [GSA IV] and its customers, tenants, lessees, sublessees, and licensees shall have the right to use, and shall have free access to, the Tower Area and Access and (Guy and/or Utility) Areas seven (7) days a week, twenty-four (24) hours a day." Ex. 5, ¶ 3; JSOF ¶ 32. Additionally, paragraph 18 of the Easement states that:

> To the extent that any public utility benefits the Tower Area and Access and Utility Area without valid easement, Grantor also grants and conveys unto Grantee, its tenants, licensees, successors, assigns, assignees, and sublessees, full, complete, uninterrupted and unconditional access to and from [ ] [Gurgone's] Property, seven days a week, 24 hours a day, over and across the common areas of any other adjacent property now or hereafter owned by [Gurgone].

Ex. 5, ¶ 18; JSOF ¶ 33.

Despite these legal description errors, it is undisputed that since 1998, Sprint, GSA IV, and their predecessors, agents, and/or affiliated entities have accessed the Site via the driveway that provides access to both the Site and Gurgone's residence. JSOF ¶ 34. The location of this driveway has been the same since the late 1990s. *Id*. ¶ 35. Since 1998, Sprint, GSA IV, and their predecessors, agents, and/or affiliated entities have used the same general underground pathway from the public utility access points near the Site to the Tower. *Id*. ¶ 36.

**A Dispute Arises Between the Parties when Gurgone Interferes with Access**

From the time the Easement was signed in 2006 until 2013, the issues with the Erroneous Legal Description never arose. *Id*. ¶ 37. It was not until 2013, when GSA IV's lessee and agents for the public utility AT & T began trenching for the on-going maintenance and upgrading of the telephone connection that Gurgone started complaining. *Id*.

In August 2014, despite GSA IV's right of 24/7 access, Gurgone installed a chain and padlock on the fence surrounding the Tower thereby blocking GSA IV's access to the Site. *Id*.

¶ 24. The chain and padlock continued to block access to the Tower at least through May 2015 until someone with GSA IV cut it off. *Id*. ¶ 25. Gurgone says he did this to get GSA IV's attention. *Id*. ¶ 26.

Around July 2015, Gurgone erected a gate, with a lock on it, at the base of his driveway which leads to his property. *Id*. ¶ 27. Gurgone has placed a sign upon the gate which says "PRIVATE PROPERTY NO TRESSPASSING ALL CELL TOWER CONTRACTORS STAY OUT! NO 'LEGAL' ACCESS." *Id*. ¶ 28. Despite requests both before and throughout litigation, and at least as of Gurgone's deposition in April 2018, the lock remains on the gate and Gurgone has refused to supply a key. *Id*. ¶¶ 27, 30. GSA IV has gone as far as to offer to put a locking mechanism which would allow both Gurgone and GSA IV access, but Gurgone refused. *Id*. ¶ 29; Ex. 9.

Gurgone has also engaged in other acts of interference such as confronting GSA IV and its agents and telling them that they have no legal right to be on his property and he even called the sheriff on them. JSOF ¶¶ 45–46. In written communications from both Gurgone, and his prior counsel, both have asserted that because the utility easement portion is missing from the documents associated with the Easement, that GSA IV is trespassing by maintaining its underground utilities and therefore Gurgone was entitled to rent for GSA IV to continue to maintain its underground utilities connecting them from the Site to the public utility pedestal. *Id*. ¶ 44.

GSA IV has on the other hand always tried to be accommodating. Prior to the 2013 trenching incident, Gurgone had claimed some fence damage. To resolve it, GSA IV agreed to repair the fence, add gravel to his driveway, and gave him a small monetary settlement. *Id*. ¶ 43. GSA IV, both directly and through its counsel have repeatedly made monetary offers to pay for the alleged damage for the vegetation caused by the 2013 trenching activities. *Id*. ¶ 42. Despite

promises (and obligations under FRCP 26) to provide damage documentation of his alleged tree and vegetation damage, as of Gurgone's deposition in April 2018, he had not gotten, or provided GSA IV, with any estimates. *Id.* ¶¶ 38–39. This is even in spite of the fact that Gurgone had landscapers give him two estimates for vegetation repairs unrelated to the 2013 trenching activities. *Id.* ¶ 40.

Overall, the undisputed facts show that Gurgone has been continually breaching the Easement as well as the Assignment (and consequently the PCS Site Agreement which he assigned to GSA IV). There is an admitted error in the exhibits to the Easement and the Assignment, which can and should be fixed, and therefore GSA IV is entitled to the declaratory and injunctive relief it has requested. GSA IV also seeks a permanent injunction ordering Gurgone to comply with the plain language of the agreements that allow GSA IV twenty-four hours per day, seven days per week access, as well as judgment on GSA IV's breach of contract claim.[1]

As to his own claims against GSA IV, Gurgone has done nothing to prove he is entitled to any of the relief he has requested. His trespass claims are based upon the flawed premise that the Erroneous Legal Description somehow renders all of GSA IV's legal rights in the Easement and Assignment a legal nullity—which runs directly contrary to Gurgone's own deposition admissions. Likewise, it ignores the fact that there are additional provisions in the Easement that provide such additional easements as necessary and it completely ignores that the PCS Site Agreement continues to exist and continues to grant GSA IV additional and independent access and utility easement rights. Gurgone's admissions also prove fatal to his request for declaratory judgment—GSA IV's

---

[1] The only monetary damage GSA IV is seeking are its attorneys' fees and costs in connection with the defense of Gurgone's erroneous claims and the fees expended by GSA IV for its counterclaims as allowed for under the PCS Site Agreement and Easement. Assuming GSA IV is successful, it will bring a motion in accordance with Northern District of Illinois Local Rule 54.3.

requests for declaratory judgment reflects the true and undisputed intent of the parties—that GSA IV would receive rights to access its Tower and connect to utilities in exchange for the six figure compensation Gurgone received. Lastly, Gurgone's creative, but misguided, Illinois Wrongful Tree Cutting Act claim also fails as utility providers are specifically excluded from such claims.

Based upon the undisputed facts of this case, GSA IV is entitled to summary judgment as a matter of law on Counts I and II of its Amended Counterclaim and Gurgone's Counts I, II, and III of his Second Amended Complaint should also be dismissed.

## LEGAL STANDARD

Summary judgment is appropriate if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute as to any material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Armstrong v. BNSF Ry. Co.*, 128 F. Supp. 3d 1079, 1081 (N.D. Ill. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party "has the burden of establishing that there is no genuine dispute as to any material fact." *Id*. at 1081–82. When deciding "whether a genuine issue of material fact exists," courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Id*. at 1082.

## ARGUMENT

**I.    GSA IV IS ENTITLED TO ITS REQUEST FOR DECLARATORY JUDGMENT**

"When the jurisdiction of a district court is based on diversity of citizenship, the court must apply the substantive law of the forum in which it sits." *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 581 (7th Cir. 1994) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). The parties do not dispute that Illinois law controls. Moreover, the contractual agreements at issue are governed by the "laws of the state in which the Site is located." Ex. 1,

¶ 19; Ex. 5, ¶ 13. While the court must apply the substantive law of the forum state, "the Illinois declaratory judgment statute is a procedural rule that creates no substantive rights." *Kole v. Vill. of Norridge*, 941 F. Supp. 2d 933, 959 (N.D. Ill. 2013) (citation omitted). Thus, the federal declaratory judgment statute governs, rather than the Illinois declaratory judgment statute. *See Household Fin. Servs., Inc. v. N. Trade Mortg. Corp.*, No. 99 C 2840, 1999 WL 782072, at *2 (N.D. Ill. Sept. 27, 1999). Nevertheless, the federal declaratory judgment statute does not, "and arguable could not, affect the underlying substantive state and federal laws that define the rights of the parties." *Med. Assurance Co., Inc. v. Hellman*, 610 F.3d 371, 377 (7th Cir. 2010). Accordingly, "[a] federal court applying the Declaratory Judgment Act must evaluate the parties' rights based on the same body of substantive law that would apply in a conventional action." *Id.*

### A. Due to a scrivener's error, an actual, substantial controversy exists between Gurgone and GSA IV.

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." Declaratory relief should be granted when "there is an actual, 'substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *NUCOR Corp.*, 28 F.3d at 577 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

There is no dispute that an actual, substantial controversy exists between Gurgone and GSA IV, who have adverse legal interests, "of sufficient immediacy and reality" to support the Court's decision to issue a declaratory judgment. *Id.* at 577. Gurgone asserts that based on the scrivener's errors, the agreements between the parties have been rendered inoperative. Conversely, GSA IV believes that despite the scrivener's errors in the agreements they are valid and enforceable

contracts and that the Court should reform the agreements to reflect the parties' intent at the time the agreements were executed. GSA IV seeks a declaration to this effect.

> **B. Based on the scrivener's error, the exhibits to the Assignment and the Easement do not reflect the true intent of the parties.**

"Illinois courts will generally grant relief for errors 'which are clerical or mathematical.'" *S.T.S. Transp. Serv., Inc. v. Volvo White Truck Corp.*, 766 F.2d 1089, 1093 (7th Cir. 1985) (quoting *Cummings v. Dusenbury*, 129 Ill. App. 3d 338, 343 (2d Dist. 1984)). A "mathematical or clerical error occurs when some term is either one-tenth or ten times as large as it should be . . . when it is added rather than subtracted; when it is overlooked." *Id.* at 1093.

The call that is missing from the access easement portion of the Erroneous Legal Description is a scrivener's errors that does not reflect the true intent of the parties. Likewise, the complete absence of a utility easement portion of the Erroneous Legal Description is a clear oversight. *See United States v. Bob Stofer Oldsmobile-Cadillac, Inc.*, 853 F.2d 1392, 1396–98 (7th Cir. 1988) (stating that failure to include a description of defendant's commercial property in a land trust, which was the basis for the parties' sales contract, was considered mutual mistake because the parties had intended to transfer the commercial property in the sales contract).

"The contract law doctrine of scrivener's error, or mutual mistake, allows a court of equity to reform a contract where a written agreement does not reflect the clear intent of the parties due to a drafting error." *Teamsters Local 673 v. Oberweis Dairy, Inc.*, 969 F. Supp. 2d 986 (N.D. Ill. 2013) (quoting *Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 894 (N.D. Ill. 2009), *aff'd*, 615 F.3d 808 (7th Cir. 2010)). Under Illinois law, "a mutual mistake of fact exists 'when the contract has been written in terms which violate the understanding of both parties.'" *Bob Stofer Oldsmobile-Cadillac, Inc.*, 853 F.2d at 1397 (citation omitted); *Cameron v. Bogusz*, 305 Ill. App. 3d 267, 272 (1st Dist. 1999) ("A mutual mistake is one where both parties understand

that the real agreement is what one party alleges it to be, then, unintentionally, a drafted and signed contract does not express the true agreement.").

Reformation of a contract is appropriate where the mistake is based on a mistake of fact, rather than of law. *See N. Tr. Co. v. MS Secs. Servs., Inc.*, No. 05 C 3370, 05 C 3373, 2006 WL 695668, at *14 (N.D. Ill. Mar. 15, 2006) (citing *Estate of Blakely v. Fed. Kemper Life Assurance Co.*, 267 Ill. App. 3d 100, 106 (2d Dist. 1994)); *see also Roots v. Uppole*, 81 Ill. App. 3d 68, 72 (3d Dist. 1980) ("A court of equity will reform a deed or other instrument of writing upon the ground of mistake provided that the mistake is one of fact rather than law, the proof clearly and convincingly shows a mistake was made, and the mistake was mutual and common to both parties to the instrument."). Reformation is a remedy that allows a party to have a "contract rewritten so that it will conform to the agreement actually reached between the parties." *N. Tr. Co.*, 2006 WL 695668, at *14. (citation omitted). The party seeking reformation must establish by clear and convincing evidence that: (i) there was a meeting of the minds that resulted in an actual agreement between the parties; (ii) the parties agreed to reduce the agreement to writing; and (iii) "at the time that the agreement was reduced to writing and executed, some agreed upon provision was omitted or one not agreed upon was inserted either through mutual mistake or through mistake by one party and fraud by the other." *Id*.

There is no dispute that actual agreements exist between the parties and that these agreements were reduced to writing. JSOF ¶¶ 5, 10, 13, 14; Exs. 1–2, 4–5. It is clear that the Erroneous Legal Description does not reflect the understanding of the parties at the time that they executed the agreements. Gurgone does not contest that when the Easement and Assignment were executed and he accepted $132,850.00, he intended to provide GSA IV with a perpetual easement to the "footprint," which is where the Tower actually sits. JSOF ¶¶ 16, 20–21. Gurgone admits

that by granting the Easement and accepting $132,850.00 from GSA IV, he intended to provide GSA IV with access to the pre-existing access and utility easement. *Id.* ¶¶ 4, 16, 20–21. Moreover, despite his assertion that the PCS Site Agreement is somehow inoperative, Gurgone admits that when he completed the Easement Purchase Agreement, he understood that GSA IV would have the same rights that Sprint had under the PCS Site Agreement. *Id.* ¶ 21. He does not dispute that there is a call missing from the access easement; his own surveyor confirmed this. *Id.* ¶¶ 17–19. There is no dispute that the Court should declare there is a scrivener's error in the Easement and the Assignment and it should declare that the Erroneous Legal Description should be amended to include the utility easement from the 1998 construction drawings that Gurgone reviewed and approved, and the missing call should be added to the access easement. *Id.* ¶¶ 12, 16.

## II. GSA IV IS ENTITLED TO JUDGMENT ON COUNT II OF ITS AMENDED COUNTERCLAIM FOR BREACH OF CONTRACT

To prevail on a breach of contract claim, a party must establish: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 759 (1st Dist. 2004)). "The question of the existence of a contract is a matter of law for determination by the court." *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007) (citation omitted). "[W]ords used in a contract must be given their 'plain and ordinary meaning.'" *Apex Med. Research, AMR, Inc. v. Arif*, 145 F. Supp. 3d 814, 828 (N.D. Ill. 2015) (quoting *Young v. Allstate Ins. Co.*, 351 Ill. App. 3d. 151, 158 (1st Dist. 2004)).

Despite Gurgone's assertions to the contrary, the PCS Site Agreement is a valid, enforceable contract. Gurgone admits that on or about May 14, 1998, he and Sprint entered into the PCS Site Agreement. JSOF ¶ 5; Ex. 1. Gurgone admits that he signed the Assignment, which

assigned the PCS Site Agreement to GSA IV.  JSOF ¶ 13; Ex. 4.  Gurgone also admits that he executed an Easement in favor of GSA IV.  JSOF ¶ 14; Ex. 5. Gurgone has presented no evidence to support his argument that the PCS Site Agreement and/or the Easement are not enforceable contracts, he only states in his answer to GSA IV's Amended Counterclaim that the agreements "are inoperative by nature of the error contained in the legal description."  Dkt. 46 ¶ 23.

GSA IV has substantially performed under the terms of the agreements.  As Gurgone acknowledged during his deposition he received valid consideration from GSA IV in exchange for the Easement and the Assignment granted to GSA IV.  JSOF ¶ 31; Ex. 4 and Ex. 5.

As articulated above, the PCS Site Agreement provides GSA IV "a non-exclusive easement for reasonable access thereto and to the appropriate, in the discretion of [Sprint], source of electric and telephone facilities . . . [Sprint] will have access to the Site 24 hours per day, 7 days per week." Ex. 1, ¶ 1.  Similarly, pursuant to the Easement "[a]t all times during the Term of the Easement, [GSA IV] . . . shall have free access to, the Tower Area and Access and (Guy and/or Utility) Areas seven (7) days a week, twenty-four (24) hours a day."  Ex. 5, ¶ 3.  Even with the missing call from the Easement, and the missing utility easement, paragraph 18 of the Easement grants GSA IV "full, complete, uninterrupted and unconditional access" to and from Gurgone's property to maintain the Tower.  *Id*. ¶ 18.  Moreover, Gurgone has acknowledged that he expected GSA IV to have access to the Tower and that he expected that GSA IV would have the same rights Sprint had under the PCS Site Agreement.  JSOF ¶¶ 20–21.

Despite these straightforward and unambiguous terms, Gurgone engaged in a series of actions which resulted in a breach of the terms of the PCS Site Agreement and the Easement.  It is undisputed that on numerous occasions Gurgone repeatedly denied GSA IV and its agents the twenty-four hours a day, seven days a week access that it is entitled to under both the PSC Site

Agreement and the Easement. *Id*. ¶¶ 24–25, 27, 30. Gurgone denied GSA IV access to the Site by installing a lock on the gate and chain link fence that surround the Tower. *Id*. ¶¶ 24–25. After the lock on the fence surrounding the Tower was cut off by an agent of GSA IV, Gurgone then installed a gate with another lock at the base of his driveway—the access road—and placed numerous no trespassing signs indicating "ALL CELL TOWER CONTRACTORS STAY OUT! NO 'LEGAL' ACCESS." *Id*. ¶¶ 27–28. GSA IV has offered to place a locking mechanism on the gate which would allow Gurgone and GSA IV's agents to use the access road, but Gurgone has refused and the lock remains. *Id*. ¶¶ 29–30. Gurgone has frequently confronted GSA IV and its agents telling them to leave his property and stating that they have no legal right to be on his property. *Id*. ¶ 45. He has also called the Sheriff's Office on them. *Id*. ¶ 46.

To the extent Gurgone claims that GSA IV breached the agreements due to the 2013 trenching activities—the record is clear, GSA IV has offered to remediate or pay for any harm allegedly caused by these activities but Gurgone has refused—even as of this date in this Lawsuit—to provide any estimate of damages.[2] *Id*. ¶¶ 38, 39, 42. In the past, GSA IV paid and remediated the alleged damage brought to its attention by Gurgone. *Id*. ¶ 43. Each of Gurgone's actions constitute a breach of the PCS Site Agreement and the Easement.

### III. THE COURT SHOULD DISMISS GURGONE'S CLAIM FOR TRESPASS

"Trespass is a tort committed by the 'invasion in the exclusive possession and physical condition of land.'" *Jackson v. Bank of N.Y.*, 62 F. Supp. 3d 802, 812 (N.D. Ill. 2014) (quoting *Millers Mut. Ins. Ass'n of Ill. v. Graham Oil Co.*, 282 Ill. App. 3d 129, 139 (2d Dist. 1996)). Gurgone asserts that GSA IV and its agents and subcontractors have illegally entered on to his

---

[2] Gurgone's claim is even further suspect when taken with the fact that he obtained landscaper damage estimates for a separate incident by a contractor called PT Ferro, and he accepted a $15,760.04 settlement from PT Ferro's insurer, but never had any of the alleged property damage remediated. JSOF ¶¶40–41.

property between 1998 and 2016 to "perform maintenance work, install fiber optic and utility lines well outside of the site and easement area, and perform additional construction on the cell tower." Dkt. 17 ¶ 10. As explained in greater detail above, GSA IV and its agents have enforceable legal rights and Gurgone has now repeatedly admitted that he understood he was giving GSA IV these rights through the Easement and the Assignment. Given the unambiguous language in the agreements and his own admissions, any entry on to Gurgone's land cannot be considered an "invasion in the exclusive possession and physical condition" of Gurgone's property. GSA IV paid Gurgone a significant sum for both exclusive and non-exclusive rights of possession.

Alternatively, Gurgone has not supported any of his claims for damages, *see* Ex. 10., nor has he put forth any evidence to establish that the five-year statute of limitations, pursuant to 735 ILCS 5/13-205, does not bar his claim for trespass. *See* 735 ILCS 5/13-205. Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wisc. Dep't of Corrs.*, 175 F.3d 497, 504 (7th Cir. 1999)). Moreover, "where a claim or defense is factually unsupported, it should be disposed of on summary judgment." *Anco v. ACCO Brands USA LLC*, No. 10 C 4275, 2012 WL 774945, at *2 (N.D. Ill. Mar. 7, 2012).

## IV. THE COURT SHOULD DISMISS GURGONE'S REQUEST FOR DECLARATORY JUDGMENT

Rather than reform the Easement and the Assignment to conform to the parties' intent at the time the agreements were executed, Gurgone requests that this Court declare the PCS Site Agreement and the Easement inoperative. For the reasons explained in greater detail above, reformation is appropriate in the instant matter. Furthermore, "[i]t is settled law in Illinois that one party's mistaken opinion about the legal effect of a contract is not sufficient to void the

contract." *Vill. of Oak Park v. Schwerdtner*, 288 Ill. App. 3d. 716, 718 (1st Dist. 1997). Here, the parties intended that GSA IV would have a utility easement and that it would be able to access the Site using such easement. Gurgone's mistaken opinion about the legal effect of the Easement and the Assignment, is not sufficient to void these agreements. He has offered no explanation as to why the PCS Site Agreement is ineffectual. Thus, Count II should be dismissed.

V. **THE COURT SHOULD DISMISS GURGONE'S WRONGFUL TREE CUTTING CLAIM**

In Count III of his Amended Complaint Gurgone alleges that on at least three occasions GSA IV caused "valuable trees" to be removed from his property, without his consent. Dkt. 17 ¶¶ 19–20. Gurgone further asserts that GSA IV's removal of these trees violates the Illinois Wrongful Tree Cutting Act, 740 ILCS 185/0.01 *et seq.* ("Illinois Tree Cutting Act"), and thus, he is entitled to treble damages. Dkt. 17 ¶ 21.

Section 7 of the Illinois Tree Cutting Act provides that the provisions of the Illinois Tree Cutting Act "shall not apply to a supplier of electricity, natural gas or telephone service who may cut, or cause to be cut, any tree or timber which may impair that supplier's ability to provide safe and reliable service." 740 ILCS 185/7. It is undisputed that Sprint is the telecommunications provider that operates its equipment on the Tower and that the 2013 trenching activities of AT & T to the telecommunications pedestal it owns is what Gurgone has articulated damaged his property. JSOF ¶¶ 38, 49–51. The trenching for the utility connections were to improve and upgrade Sprint's utility service in order to provide safe and reliable telecommunications services. *Id.* ¶ 51. Sprint and AT & T are telecommunications utility providers; thus their activities are not covered by the Illinois Tree Cutting Act. *Id.* ¶¶ 52–53.

Dated: August 3, 2018	Respectfully submitted,

	/s/ Carrie A. Hall
	Attorney for Defendant/Counter-Plaintiff
	GLOBAL SIGNAL ACQUISITIONS IV LLC

	Carrie A. Hall (6269884)
	cahall@taftlaw.com
	Anne L. Yonover (6321766)
	ayonover@taftlaw.com
	TAFT STETTINIUS & HOLLISTER LLP
	111 E. Wacker Drive, Suite 2800
	Chicago, Illinois 60601
	Telephone: 312-527-4000

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record in this matter, hereby certifies that on August 3, 2018, I caused a copy of the foregoing to be filed with the Court's CM/ECF system, which provides notice to all counsel of record via electronic mail.

/s/ Carrie A. Hall