# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MICHAEL GURGONE,

    Plaintiff/Counter-Defendant,

v.

GLOBAL SIGNAL ACQUISITIONS IV LLC,

    Defendant/Counter-Plaintiff.

Case No. 16 CV 10549

Judge Sara L. Ellis

## JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS

Now comes the Parties, Plaintiff/Counter-Defendant, MICHAEL GURGONE ("Gurgone"), and Defendant/Counter-Plaintiff GLOBAL SIGNAL ACQUISITIONS IV LLC ("GSA IV"), by and through their counsel, and hereby submit their Joint Statement of Undisputed Material Facts and state as follows:

1. Gurgone is an individual domiciled in New Lenox, Will County, Illinois, and therefore is a citizen of Illinois. *See* Dkt. 45, ¶ 3; *and* Dkt. 46, ¶ 3.

2. GSA IV is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Houston, Texas. **Castillo Declaration**, ¶ 4.

3. GSA IV's sole member is Global Signal Operating Partnership L.P., a Delaware limited partnership with its headquarters in Houston, Texas. Global Signal Operating Partnership L.P.'s partners are CCGS Holdings Corp., and Global Signal GP LLC. CCGS Holdings Corp is a Delaware corporation with its headquarters in Houston, Texas. Global Signal GP LLC is a Delaware limited liability company, with its sole member being CCGS Holdings Corp., a Delaware corporation with its headquarters in Houston, Texas. *Id*., ¶¶ 5–6.

4. The amount in controversy in this case exceeds $75,000.00. The perpetual easement at issue in this matter was purchased by GSA IV for $132,850.00. **Gurgone Dep**. 51:5-16. Gurgone seeks damages in the amount of at least $100,000.00. Dkt. 17, ¶¶ 13 B, 21 B.

5. On or about May 14, 1998, Gurgone[1] and SprintCom, Inc. ("Sprint") entered into a PCS Site Agreement which provided, in part, that Gurgone leased to Sprint a certain Site, located

---

[1] The agreements at issue were also executed by Michael Gurgone's wife Sherri Gurgone, who is deceased and thus is not made a party to this action. Gurgone solely owns the property now. **Gurgone Dep.** 7:8-20.

at 1121 Bjork Drive, County of Will, Illinois, for the purpose of erecting, operating and maintaining a communications tower (the "Tower").  *See* Dkt. 45, ¶ 7; *and* Dkt. 46, ¶ 7.

6. A true and correct copy of the PCS Site Agreement (with the rental amount redacted) is attached as **Exhibit 1**.

7. The PCS Site Agreement grants Sprint "a non-exclusive easement for reasonable access thereto and to the appropriate, in the discretion of [Sprint], source of electric and telephone facilities." **Exhibit 1**, ¶ 1.

8. The PCS Site Agreement states "SprintCom will have access to the Site 24 hours per day, 7 days per week." ***Id.***

9. The PCS Site Agreement was for an initial term of five (5) years with four (4) additional renewal terms of five (5) years each.  **Exhibit 1**, ¶ 2.

10. Sprint and Gurgone executed a Memorandum of the PCS Site Agreement, evidencing the existence of the PCS Site Agreement.  A true and correct copy of the Memorandum of the PCS Site Agreement is attached as **Exhibit 2.**

11. Both the PCS Site Agreement and the Memorandum of the PCS Agreement contain the same hand drawn sketches of the Site and a true and correct legal description of the parent parcel.  **Exhibit 1 and Exhibit 2; Gurgone Dep.** 69:15-21.

12. At or around the time the PCS Site Agreement and Memorandum of the PCS Site Agreement were executed, Sprint presented, and Gurgone reviewed and approved, oversized construction drawings prepared by Fullerton Contracting Company, which reflect an "Issued for Comment" date of May 25, 1998 and an "Issued for Permit" date of May 28, 1998. Reduced sized copies of same are attached hereto as **Exhibit 3 (Gurgone Dep. Ex. 1)**; **Gurgone Dep.** 42:7-23.

13. On or about June 2, 2006, Gurgone and GSA IV entered into an Assignment and Assumption of Lease Agreement whereby Gurgone agreed to "convey, transfer, and assign" to GSA IV the PCS Site Agreement referenced above.  A true and correct copy of the Assignment and Assumption of Lease Agreement is attached as **Exhibit 4**.

14. On or about June 2, 2006, Gurgone executed an Easement in favor of GSA IV regarding the Site and access thereto.  A true and correct copy of the Easement is attached as **Exhibit 5**.

15. The same legal description of the Access and Utility Easement appears as Exhibit B to the Assignment and Assumption of Lease Agreement (**Exhibit 4**) and as Exhibit C to the Easement (**Exhibit 5**.)  Hereinafter this same legal description will be referred to as the "Erroneous Legal Description."

16. Neither the PCS Site Agreement, the Memorandum of the PCS Site Agreement, nor the Erroneous Legal Description contain a legal description for a utility easement (Dkt. 45, ¶ 19; Dkt. 46, ¶ 19), but Gurgone always expected that the utilities would be placed within the utilities

easement legal description and boundaries depicted on page 2 of **Exhibit 3**. **Gurgone Dep.** 70:10-20; **Exhibits 1, 2, 4 and 5.**

17. There is a call missing from the Erroneous Legal Description in the access easement portion of the Access and Utility easement in the Assignment and Assumption of Lease Agreement (**Exhibit 4**) and as Exhibit C to the Easement (**Exhibit 5**). *See* Dkt. 45, ¶ 18; *and* Dkt. 46, ¶ 18.

18. A survey prepared just before the signing of the Assignment and Assumption of Lease Agreement and the Easement, when compared to the access easement portion of the Erroneous Legal Description shows that "THENCE NORTH 43 DEGREES 02 MINUTES 36 SECONDS EAST" is missing from the access easement portion from the legal description in the Erroneous Legal Description. **Exhibit 6** (CC-GRGN 1395).

19. A survey commissioned by Gurgone confirmed that there is an error in the access easement portion of the Easement legal description. **Gurgone Dep.** 94-95:13-1.

20. Gurgone knew and expected that GSA IV expected access to the Tower in exchange for the consideration paid under the Easement agreement. **Gurgone Dep.** 95:10-12.

21. Gurgone expected that the same rights and access and utility easements in place under the PCS Site Agreement would remain after the Easement purchase transaction. **Gurgone Dep.** 52:5-10, 56:6-21; 95:2-12.

22. Gurgone acknowledges that GSA IV has at a right to an access right to access the Tower as per the drawings in **Exhibit 3**. **Gurgone Dep.** 99:11-16.

23. Gurgone knew Sprint would need to use part of his driveway to get to the Tower. **Gurgone Dep.** 19:9-11.

24. Gurgone placed a chain and padlock around the Tower compound around August 2014. **Gurgone Dep.** 87-88:20-10; **Exhibit 7** (CC-GRGN 0066).

25. The lock on the Tower compound continued at least through May 2015. **Exhibit 8** (CC-GRGN 0111). The lock was eventually cut off by someone associated with GSA IV. **Gurgone Dep.** 89:6-9; 90:15-24.

26. Gurgone placed the lock on the fence surrounding the Tower to get GSA IV's attention. **Gurgone Dep.** 90:4-8.

27. Around July 2015, Gurgone erected a gate at the base of his driveway which leads to his property and is adjacent to the public street. The gate has a lock on it. Gurgone has refused to supply a key to GSA IV. Dkt. 45, Ex. 5; Dkt. 45, ¶31; Dkt. 46, ¶31; **Gurgone Dep.** 91:11-24.

28. On the gate Gurgone has placed a sign upon which says "PRIVATE PROPERTY NO TRESSPASSING ALL CELL TOWER CONTRACTORS STAY OUT! NO 'LEGAL' ACCESS." Dkt. 45-1, Ex. 5; **Gurgone Dep.** 92:1-8.

29. GSA IV has offered to install a "daisy chain" locking system on Gurgone's gate in order to allow GSA IV and its contractors access to the driveway, Gurgone has not accepted that offer. **Exhibit 9** (CC-GRGN 1038-1053 at 1051).

30. The lock remains on the gate at least as of April 2018. **Gurgone Dep.** 101-102:20-4.

31. The Easement and the Assignment and Assumption of Lease Agreement were executed at the same time as part of a transaction pursuant to an Easement Purchase Agreement wherein GSA IV was to pay and did pay Gurgone $132,850.00 (the "Easement Purchase"). *See* Dkt. 45, ¶ 20; Dkt. 46, ¶ 20; **Gurgone Dep.** 51:2-8.

32. The Easement contains a Paragraph 3 entitled "Use" which reiterates the 24 hours a day, seven days per week access and the broad rights GSA IV has to maintain and improve the Tower:

> The Tower Area shall be used for the purpose of erecting, installing, operating and maintaining radio and communications towers, equipment buildings, and equipment shelters, including leasing, subleasing, and licensing space thereon to third parties. Grantee may make any improvement, alteration or modifications to the Tower Area as are deemed appropriate by Grantee, in its discretion for the purposes set forth herein. At all times during the Term of the Easement, Grantee and its customers, tenants, lessees, sublessees, and licensees shall have the right to use, and shall have free access to, the Tower Area and Access and (Guy and/or Utility) Areas seven (7) days a week, twenty-four (24) hours a day. Grantee shall have the exclusive right to lease, sublease, license, or sublicense any radio/communications tower or any other structure or equipment on the Tower Area, and shall also have the exclusive right to lease or sublease to third parties any portion of the Tower Area, itself, but no such lease, sublease or license shall relieve or release Grantee from its obligations under this Easement. Grantee and its customers shall have the right to erect, install, maintain, and operate on the Tower Area such equipment, structures, fixtures, signs, and personal property as described in Paragraph 2, and such property, including the equipment, structures, fixtures, signs, and personal property currently on the Tower Area, shall not be deemed to be part of the Tower Area, but shall remain the property of Grantee or its customers, as applicable. At any time, Grantee or its customers shall have the right to remove their equipment, structures, fixtures, signs, and personal property from the Tower Area.

**Exhibit 5**, ¶ 3; Dkt. 45, ¶ 21; Dkt. 46, ¶ 21.

33. Paragraph 18 of the Easement contains a provision called "Other Utility Easement" which grants GSA IV broad power to use Gurgone's property for its utility connections, including underground burying of connections irrespective of whether the easement rights previously existed. It reads as follows:

4

> Other Utility Easement. To the extent that any public utility benefits the Tower Area and Access and Utility Area without valid easement, Grantor also grants and conveys unto Grantee, its tenants, licensees, successors, assigns, assignees, and sublessees, full, complete, uninterrupted and unconditional access to and from the Grantor Property, seven days a week, 24 hours a day, over and across the common areas of any other adjacent property now or hereafter owned by Grantor, for, without limitation, ingress and egress to and from the Grantor Property, as well as the installation, location, and maintenance of overhead and/or underground utility connections, including electric, telephone, gas, water, sewer, and any other utility connection. Grantee's use of such utility easements shall not interfere with Grantor's normal use and enjoyment of the Grantor Property. The rights conferred pursuant to this paragraph may be partially assigned by Grantee to any private or public utility authority to provide utilities to the Grantor Property, or to otherwise further effect this provision.

**Exhibit 5**, ¶ 18; Dkt. 45, ¶ 22; Dkt. 46, ¶ 22.

34. Since 1998, Sprint, GSA IV, and their predecessors, agents and/or affiliated entities have accessed the Site via an existing driveway that provides vehicular access to both the Site and Gurgone's residence. *See* Dkt. 45, ¶ 27; Dkt. 46, ¶ 27.

35. The location of this driveway has remained the same since the late 1990s. **Gurgone Dep.** 22:15-21.

36. Since 1998, Sprint, GSA IV, and their predecessors, agents and/or affiliated entities have used the same general underground pathway from the public utility access points near the Site to the Tower. *See* Dkt. 45, ¶ 28; Dkt. 46, ¶ 28.

37. It was not until GSA IV's lessees and agents for the public utility AT & T began trenching for the on-going maintenance of utility connections in 2013 that Gurgone began to complain about the legal description in the access or utility easements, and to claim a trespass due to the scrivener's errors. *See* Dkt. 45, ¶ 29; Dkt. 46, ¶ 29.

38. Counsel for GSA IV has made repeated written requests for arborist or landscaper estimates for the alleged damage to vegetation caused by the 2013 trenching activities. Despite repeated requests, neither Gurgone nor any of his various attorneys have ever provided copies of same to counsel. *See* Dkt. 45, ¶ 33; Dkt. 46, ¶ 33. **Gurgone Dep.** 79:7-17.

39. As of Gurgone's deposition in April 2018, he still had not obtained any written estimate for the alleged vegetation damage caused by the 2013 trenching activities. **Gurgone Dep.** 85-87:13-6.

40. Gurgone received written quotes from two different landscaping services for alleged vegetation damage caused by PT Ferro that was after and unrelated to the alleged damage caused by the 2013 trenching activities. **Gurgone Dep.** 79-85:7-12.

41. Gurgone reached a settlement with PT Ferro's insurer and received $15,760.04. **Gurgone Dep.** 84-85:14-7. He signed a release as well but he does not have a copy of that release.

5

*Id.*, 81:1-22.  Gurgone never used that $15,760.04 settlement to have any alleged damaged vegetation repaired.  *Id.*, 81-82:23-3; 82-83:17-2.

42. GSA IV, both directly and through its counsel have repeatedly made monetary offers to pay for the alleged damage for the vegetation caused by the 2013 trenching activities.  Dkt. 45, ¶ 34; Dkt. 46, ¶ 34.

43. When Gurgone had a prior issue with some damage to a fence, his attorney brought it to the attention of GSA IV, GSA IV made a repair to the fence, fixed his driveway, and gave him a small monetary settlement.  **Gurgone Dep.** 49:12-23.

44. In written communications from both Gurgone, and his prior counsel, both have asserted that because the utility easement portion is missing from the documents associated with the Easement Purchase, that GSA IV is trespassing by maintaining its underground utilities and therefore Gurgone is somehow entitled to rent for GSA IV to continue to maintain its underground utilities connecting them from the Site to the public utility pedestal.  Dkt. 45; ¶ 35, Dkt. 46, ¶ 35.

45. Gurgone has also frequently confronted GSA IV and its agents telling them to leave his property and advising them that they had no legal right to be on his property.  Dkt. 45, ¶ 37; Dkt. 46, ¶ 37.

46. Gurgone has called the Sheriff on contractors working on Tower related activities on more than one occasion.  **Gurgone Dep.** 80:2-16; 93:14-20.

47. The PCS Site Agreement sets forth that "the prevailing party in any action or proceeding in court or mutually agreed upon arbitration proceeding to enforce the terms of this Agreement is entitled to receive its reasonable attorneys' fees and other reasonable enforcement costs and expenses from the non-prevailing party."  **Exhibit 1**, ¶ 19(f).

48. The Easement provides for fee shifting to the prevailing party "in connection with any legal proceeding arising from or based" upon the Easement.  **Exhibit 5**, ¶ 13.

49. Sprint (and its subsidiaries and/or affiliates) is and has been the communications company operating equipment on the Tower since the time of GSA IV's purchase of the Easement.  **Castillo Declaration**, ¶ 7.

50. AT & T is the communications company that owns the telecommunications pedestal at the Site. **Castillo Declaration**, ¶ 8.

51. The 2013 trenching activities were done to improve and upgrade Sprint's utility service from the Tower in order to provide safe and reliable telecommunications services.  **Castillo Declaration**, ¶ 9.

52. Sprint is a telecommunications provider as recognized by its registration with the Illinois Commerce Commission. *Utility Profile, SprintCom, Inc.*, Illinois Commerce Commission, https://www.icc.illinois.gov/utility/certificates.aspx?id=1417 (last visited July 23, 2018).

53. AT & T is a telecommunications provider as recognized by its registration with the Illinois Commerce Commission. *Utility Profile, AT&T Corp.*, Illinois Commerce Commission, https://www.icc.illinois.gov/utility/certificates.aspx?id=3181 (last visited July 23, 2018).

Dated: August 3, 2018

/s/ Carrie A. Hall
Attorney for Defendant/Counter-Plaintiff
GLOBAL SIGNAL ACQUISITIONS IV LLC

Carrie A. Hall (6269884)
cahall@taftlaw.com
Anne L. Yonover (6321766)
ayonover@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone: 312-527-4000

**CERTIFICATE OF SERVICE**

The undersigned, an attorney of record in this matter, hereby certifies that on August 3, 2018, I caused a copy of the foregoing to be filed with the Court's CM/ECF system, which provides notice to all counsel of record via electronic mail.

/s/ Carrie A. Hall